IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
DELTA DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v. No. 2:25CR00003-1,2,3 LPR

October 26, 2026
Little Rock, Arkansas

LEROY TAYLOR, KENNETH WAYNE FOWLER,
MELODY NICOLE SYLVIA,

Defendants.

**EXCERPTED TRANSCRIPT OF SUPPRESSION HEARING**
**COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW**
BEFORE THE HONORABLE LEE RUDOFSKY,
UNITED STATES DISTRICT JUDGE

---

APPEARANCES:

On Behalf of the Government:
MR. BART DICKINSON, Assistant U.S. Attorney
MR. JOHN WEBSTER, Assistant U.S. Attorney
U.S. Attorney's Office
Eastern District of Arkansas
Post Office Box 1229
Little Rock, Arkansas 72203-1229

On Behalf of the Defendant Taylor:
MR. PATRICK J. BENCA, Attorney at Law
15 Sugar Creek Road
North Little Rock, Arkansas 72116

On Behalf of the Defendant Fowler:
MR. JOHN WESLEY HALL, Attorney at Law
Law Offices of John Wesley Hall, Jr., PA
1202 Main Street, Suite 210
Little Rock, Arkansas 72202

continued...

APPEARANCES CONTINUED:

On Behalf of the Defendant Sylvia:

MR. TONEY BAKER BRASUELL, Attorney at Law
Brasuell Law Firm, PLLC
3700 Old Cantrell Road, Suite 102
Little Rock, Arkansas 72202

*Proceedings reported by machine stenography; transcript prepared utilizing computer-aided transcription.*

* * * * * * * * * * * * *

[Excerpted here.]

THE COURT: Okay. I understand your position as to that. I get it. So I am going to make some findings of fact and conclusions of law now and then I'm going to take certain things under advisement. Number one, I am going to find that both Mr. Taylor and Mr. Fowler lack a reasonable expectation of privacy in the hotel and the suitcase. They have not in my view, met their burden, which as I understand it, is just a more likely than not burden. They have not met their burden to show a reasonable expectation of privacy, individual reasonable expectation of privacy in the hotel room or in the suitcase, and again, that sort of is a lay matter. We call that a lack of standing although it's not really standing, but it's a merits issue, but essentially they can't object to it unless it's interfering with their individual reasonable expectation of privacy. So the way I understand the facts here, Mr. Taylor showed up -- sorry, Mr. Fowler showed up, is that correct? The first person on scene was Mr. Fowler?

MR. DICKINSON: Yes, Your Honor.

THE COURT: Let me make sure I make that clear. Mr. Fowler showed up at the hotel, rented room 140, then a couple of hours later, Ms. Sylvia showed up, rented room 168. I acknowledge that there is some testimony as to saying sort of both of them rented the rooms, you know, sort of rooms plural

with the idea or the inference being that each of them rented each room or both of them sort of were renting both 140 and 168. I acknowledge that there's some evidence in the record to that. The far stronger evidence, both documentary and testimonial evidence, is that Sylvia rented -- Ms. Sylvia rented room 168 and Mr. Fowler rented 140.

As I understand it, then Mr. Fowler helped Ms. Sylvia with the bag in question which we have admitted into evidence and also with a brown paper bag that we see on one of the video clips. Helped Ms. Sylvia with those bags which came from Ms. Sylvia's car into room 168, and I do think it is more likely -- more likely than not at that point, they left -- they left the room and did not return. Now, I'm going to tell you after I make these findings, I'm going to put us on pause for about 20 minutes and I'm gonna go back and watch the video clips and make sure this is all accurate.

But based on what I know now, these are my findings and, quite frankly, I know both Mr. Dickinson and I also know most of the defense counsel here, I have no reason to suspect that the testimony is going to show me or the clips are going to show me anything different than what I've heard in the testimony. I do acknowledge that there are going to be gaps in the clips, that we don't have all of the activities from that night, but in my view, Mr. Fowler and Mr. Taylor had the burden to show that they rented the room and/or they were overnight

guests in that room and they have not met that burden.

To the extent they have really anything to do with that room, the only thing they have to do with that room is that, you know, they were using that room for sort of nonresidential purposes much like, you know, the Carter set of cases from the Supreme Court, but I don't even think we get there. I don't think Mr. Taylor has showed he even went in the room at all. And I don't think that Mr. Fowler has showed that he was in the room for any other reason than what he affirmatively said was just to drop off Ms. Sylvia's bags or the bags that Ms. Sylvia had brought. Mr. Fowler said he didn't know what was in the bag, he said that the bags weren't his, that he didn't stay in room 168 and that he didn't rent room 168. And Mr. Taylor wasn't even there when the room was rented. There's no suggestion from what's on the rental documentation that it was Mr. Taylor's room or rented from Mr. Taylor or anything like that.

I acknowledge that it appears from the evidence that Ms. Sylvia gave Mr. Taylor a key card and that then when he went to the front desk and said that his key card wasn't working, this is, you know, later when he showed up on the scene, when he went to the front desk to say that he -- that he needed a card, the front desk gave him a card, I acknowledge all those things, but nonetheless, I do not find by a preponderance of the evidence that he's shown that he was an

overnight guest in that room or that it was his room in any way, shape or form. Without that, I do not think he can have an expectation of privacy in the room as for Mr. Taylor. And I don't think he's made any argument that outside of that he has some other independent expectation of privacy in the luggage. I've already explained why Mr. Fowler doesn't, and I think, quite frankly, Mr. Hall acknowledged and conceded that Mr. Fowler doesn't have standing for a Fourth Amendment claim here, again, using the term "standing" loosely.

With respect to Mr. Fowler and his Fifth Amendment claim, Mr. Hall, I acknowledge that the government didn't reply on this in their brief, or at least not that I saw. I also acknowledge that there hasn't been a significant argument made about this here today, but I think that the Fifth Amendment claim is, and I don't say this as a frustration, I have no problem with you bringing it up, but I think the idea that there's a Fifth Amendment claim here is just specious and so far from a possibility that I'm not willing to suggest that there's any kind of Fifth Amendment problem here.

I don't think the cases bear it out. Number one, I think that we -- that there is a Fourth Amendment analysis here and when there's a controlling bill of rights analysis, I don't think you're supposed to go to the due process clause and I don't think -- you don't say, oh, he doesn't have standing to bring the Fourth Amendment one, therefore he gets to use the

Fifth Amendment because the Fourth Amendment one is part of the merits analysis so the fact that he loses under the Fourth Amendment is the whole ballgame. Even if it's on what we sort of lay, in a lay way refer to as standing. But even if I didn't think that, even if we were supposed to get to an actual Fifth Amendment analysis, there's nothing in this case that comes anywhere close to things that have been thought of as outrageous conduct beyond all sort of civilized boundaries. This is just not that type of case. Now, it may well be, we'll see, I'll have to think about it more with respect to Ms. Sylvia, it may well be that this was an unconstitutional search. It may well be that the police did something wrong here, but this is not kind of sort of intentional sort of nefariousness on the front end that in my view comes anywhere close to a Fifth Amendment violation in terms of egregiousness.

So with respect to Mr. Taylor and Mr. Fowler, I do not think there's a viable Fourth or Fifth Amendment claim. I know Mr. Taylor didn't make the Fifth Amendment claim so I am not going to suppress so I'm going to deny the motions on those grounds alone. I am going to take Ms. Sylvia's motion under advisement. I think that is a much more difficult question. And I really don't want to hazard an answer here. I am going to go back for 15 or 20 minutes, probably 20 minutes and watch the clips and make sure that nothing in the clips changed my mind about this. And then I'll come out again and let you know

where I stand. Before I do that, this is not the time for reargument, but is there anything that somebody wants me to make an additional factual or legal finding on as to what I've just discussed, Mr. Dickinson?

MR. DICKINSON: No, Your Honor.

THE COURT: Mr. Benca?

MR. BENCA: No, Your Honor.

THE COURT: Mr. Brasuell?

MR. BRASUELL: No, Your Honor.

THE COURT: Mr. Hall?

MR. HALL: No, Your Honor.

THE COURT: Everybody can stand in recess for about 20 minutes and I'll be back.

(Recess from 3:57 PM until 4:15 PM.)

THE COURT: I have watched the videos. Some of them I sped up a little bit. I put my finger on the sort of drag button and I dragged it a little bit because you can actually see them as stills as you're dragging it, so there was a lot of the video that quite frankly was empty, like, air time where nothing was going on so I dragged it. My only point is I don't know that it's actually been 15 or 16 minutes, but I have looked at all of the videos. I only have sort of two quick things to say about them and, quite frankly, nothing changes anything.

But number one, when Ms. Sylvia first arrived, it appears

that she was not driving her own car, it appears that either it was an Uber or a taxi or at least there was a third person who was driving and then left. That doesn't change anything. Still her bags, still she arrived in that car, all of that. But I do want to say I don't believe she was driving that car, so to the extent I suggested that, that's incorrect. Secondly, for what it's worth, it does appear at one of the 7:00 a.m. videos that Ms. Sylvia is exiting room 140 with wet hair. Now, I can't absolutely say she wasn't in room 168 beforehand. I'm not prepared to say that. I'm just telling you-all that it does look like for whatever it's worth in the morning, it does look like both Mr. Fowler and Ms. Sylvia were exiting room 140, went into the car and left. Doesn't necessarily change anything, just wanted to make those points clear on the record.

I also do want to say again with respect to Mr. Fowler, and I'm just going to emphasize this, one of the most important things here for me is that in his briefing, Mr. Fowler made very clear that he didn't rent or stay in room 168, and it wasn't his bag. And then he says all they have is him arriving in another vehicle, moving the suitcase for Sylvia, putting it in room 168 and not going back to the room. They show nothing of his knowledge of the contents of that suitcase. He didn't even transport it there. And, of course, Mr. Hall has, again, I think, entirely properly and appropriately conceded that Mr. Fowler doesn't have standing for Fourth Amendment purposes.

And then again, I'm just going to emphasize with respect to Mr. Taylor, nothing on that video makes any difference with respect to Mr. Taylor because there's nothing to suggest in any way, shape or form that Mr. Taylor was there on the night in question. There's nothing to suggest that he personally rented the room. His name wasn't on the documents. I understand the argument that the room was rented for him in some way or he had access to that room, but to the extent that Mr. Taylor bears the burden to prove a reasonable expectation of privacy, which I think he does, he has not met that burden. Certainly the mere fact that he was given or had a key to that room does not meet that burden and there's no suggestion in my mind and there's no evidence to suggest that he was an overnight guest or that he was the renter of that room.

And to the extent there's even any evidence that suggests it, which I'm not sure there is, but to the extent there's any evidence, it's overcome by the other evidence that shows Mr. Taylor was not there that night and there's no suggestion he was there that night or that he rented the room or that he was on the rental papers. So it's more likely than not in my view -- I guess I should say this way. Mr. Taylor has not established that it's more likely than not that he has a reasonable expectation of privacy in either the room or the suitcase. Again, I know I just went over some of the stuff I previously did, but I wanted to sort of make clear where my

rulings were. I don't think anything I've said changed it, I just think I've emphasized certain things more. I'll ask again, Mr. Dickinson, any other findings of fact or conclusions of law you think I need to make?

MR. DICKINSON: No, Your Honor.

THE COURT: Mr. Benca?

MR. BENCA: Yes, Your Honor, I do. And as to the standing issue and as to the key issue where I provided the Court with a hallucinated citation, I did do research on that issue and I have the research, I was able to access it, so I would like the ability to provide case law to the Court with regard to the standing and as to the key issue because I think that there is cases in this district and I think there's another case outside the district but obviously I'm a little shell shocked right now, so I want to make sure that I go out and actually do what I need to do with regard to it, but I think it's a valid issue and I don't want to -- I don't want to drop the issue just because I had a --

THE COURT: So what are the cases you want to provide?

MR. BENCA: No, I'm not going to -- I have the research that talks about it, and it's pretty thoughtful.

THE COURT: Can I ask you something? And I sure hope your answer is not yes to this. When you say you have the research, are you talking about AI research?

MR. BENCA: No, I'm not.

THE COURT: How did you do the research?

MR. BENCA: Listen, I'm a sole practitioner, I only have -- the AI option was a good option for me at the time. But I understand. But I still use AI to the degree that I've been trained to do it, I just know how to cross reference it now to make sure that what I'm citing is exactly what is. But I think that the key issue -- listen, prior to AI ever being in existence, I had -- I've been a Fourth Amendment attorney, I worked with John Wesley Hall, and the key issue has been an issue. I'm not talking about -- I'm talking about the hotel key and the giving of that hotel key to someone else in order for them to use, and I remember distinctly it was called the key issue in one of the cases.

And I think it was an Eighth Circuit, I want to say maybe Ramirez. It may not have actually cited this particular case, but it did discuss the importance or that standing just doesn't go away just by the mere fact that because they have a key. If they have a key, there's at least an argument that can be made that that person has standing to the room even if they've never accessed that room. So I want to be able to research that.

THE COURT: Let me stop you and ask you again. I want to make sure when you are telling me this, I think, and maybe I misunderstood you, that's perfectly fair, when you were sitting down there, I thought you said you had researched it

while I was gone. Maybe that was a misunderstanding.

MR. BENCA: That was a misunderstanding.

THE COURT: Maybe instead what you were saying is like when you explained to me earlier during your argument you have researched this in some way in the past, think you remember it and would like more time to research it and submit a brief on it. Is that correct?

MR. BENCA: Correct, because the search that was done on AI was done off of my memory of what I've litigated before.

THE COURT: Okay, I got it. That request is denied. Number one, you have had more than enough time to do research and present here today. Number two, as I understand it, Mr. Dickinson brought this up in a response brief and you did not ask to file a reply or file a reply or anything like that, and Mr. Dickinson's brief was filed -- let me make sure I get this right. Mr. Dickinson's brief was filed May 11, 2026. And so we're now talking multiple months that you had to prepare for this issue. But you haven't brought us more cases today.

You've had time to research it. I do not believe -- first of all, I don't actually think there are any serious cases that suggest in this circumstance there's going to be standing, but beyond that, you haven't brought that stuff today, I don't understand why you haven't, and why I should give you extra time to submit something later that the

government is now going to need to respond to again.

MR. BENCA: I don't think necessarily they have to respond to it, it's just the issue. I agree that it was misstated in the brief. But I don't think that that precludes my client from at least the Court inquiring as to whether the issue is fair.

THE COURT: I agree with that. What I'm telling you, though, is, there's a proper order to doing these things and if you wanted to get cases in front of me, quite frankly, it should have been in a brief before the hearing, but despite that, at the very latest, you knew this issue was going to come up, this was obviously a central issue in the case. At the very least, you should have had cases to provide here today. What I'm asking you is what is the reason I should say okay, you didn't do what you were supposed to do beforehand, you didn't bring me any cases today but I should authorize supplemental briefing which is then gonna make the government go out of its way and respond. I know you don't think they have to respond, but I'm guessing they would like to respond because you're going to come up with cases that they haven't seen and argued about. Why would I possibly do that at this point?

MR. BENCA: First of all, as an attorney, I'm standing here and I want my client to know that I've done everything that I possibly can for them. That's where it's at.

And I want to be able to say that when I do, when I have made a failure and I haven't done what I'm supposed to be able to do to stand up in front of the Court and say, look, I didn't do it, I made a mistake, and we go in and talk about how that came to be or whatever, but the fact of the matter is it shouldn't be held against my client, okay?

And I know in my heart of hearts after doing this for as long as I have and coming in here and failing this court by doing what I did put in the brief and failing and putting a case in there that was not appropriate and not cross referencing it, I don't want my client to walk out of here feeling that he didn't get a fair shake --

THE COURT: But do you want --

MR. BENCA: Can I finish?

THE COURT: No, you can let me ask questions when I want to. Do you understand that it's not just about putting an incorrect case in a brief, but it's also about not coming prepared with research that when you know you have an incorrect case in the brief, not doing the research you think is out there to then present at an appropriate time. We're not just talking -- do you understand that or no?

MR. BENCA: Listen, I do understand that and I failed in that regard. But I do not want that failure to stem -- I want to be able to at least walk out of this courtroom and say, look, I messed up with regard to citing the

right case, but I know that the Court took into consideration the argument that I was making and the point that I was attempting to make. I know there's cases out there that say what it is I say.

THE COURT: Here's what I will allow you to do. I will allow you to file a three-page supplemental brief. The government does not need to respond unless I suggest that something in there is going to potentially make me change my mind. I will tell the government for purposes of its being able to sleep at night, I have thoroughly researched this and I do not believe that there is anything out there in the universe that could make me change my mind on this, but on the other hand, I keep an open mind, we'll see what Mr. Benca finds.

Before I were to change my mind if I had any inkling of that, I would obviously give you all a chance to respond if you want to. However, once Mr. Benca files, I will put a very short notice on the docket as to whether anything in that brief has me rethinking this issue or not. And if the answer is it does, then I will give you all some time to file a response. I will just say for the record, this is quite frankly not something I need to do and perhaps not something I should do, and it's going to cost the government time and money and I apologize for that, but given that this is a criminal case and Mr. Taylor is looking at significant time, I'm going to be as careful as I can with his rights and let a full airing go on

here. So that's where I am.

MR. BENCA: I appreciate that. Thank you.

THE COURT: Within seven days.

MR. BENCA: Absolutely.

THE COURT: Seven days from today's date, not a moment later, no extensions, no anything. Three pages, and only on this issue.

MR. BENCA: Yes, Your Honor, thank you. I appreciate that.

THE COURT: Other than that, anything else you want me to add with respect to findings of fact or conclusions of law?

MR. BENCA: No, Your Honor. Thank you.

THE COURT: Mr. Brasuell?

MR. BRASUELL: No, Your Honor.

THE COURT: Mr. Hall?

MR. HALL: No, Your Honor.

THE COURT: We're adjourned.

(Proceedings adjourned at 4:29 PM.)

REPORTER'S CERTIFICATE

I certify that the foregoing is a correct excerpted transcript from the proceedings in the above-entitled matter held on October 26, 2026.

/s/ Karen Dellinger, RDR, CRR, CCR
-----------------------------------
United States Court Reporter

Date: October 29, 2026